IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CALVIN MITCHELL,                    )
                                    )
                 Plaintiff,         )
                                    )
vs.                                 )    Case No. 13–cv–0860–MJR–SCW
                                    )
STEPHEN BAKER and                   )
KIM BUTLER,                         )
                                    )
                 Defendant.         )

## MEMORANDUM & ORDER

**REAGAN, Chief Judge:**

The undersigned is well aware of federal courts' duty to avoid entanglement in the day-to-day affairs of prison administrators. The Supreme Court has described modern prison administration as an "inordinately difficult undertaking," *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989), and has repeatedly cautioned that prison officials have "broad administrative and discretionary authority over the institutions they manage," *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)). Nevertheless, federal courts are under a duty to enforce the constitutional rights of prisoners. *Brown v. Plata*, 131 S.Ct. 1910, 1928–29 (2011). In this judicial district, approximately forty percent of each day's filings occur in civil cases where state or federal prisoners have sued prison officials for alleged violations of their constitutional rights. The undersigned does not recall, in fourteen years on the bench, granting preliminary injunctive relief to a prisoner seeking a transfer.

This case, however, is unique.  Plaintiff Calvin Mitchell, an inmate at Menard Correctional Center in the Illinois Department of Corrections ("IDOC"), sued Correctional Officer Stephen Baker for allegedly victimizing Plaintiff via physical abuse and threats.  Plaintiff seeks monetary damages totaling $40,000, plus a permanent injunction such that he is transferred away from Menard while Baker works there.  Mitchell has moved several times for preliminary injunctive relief (in the form of a transfer for the pendency of the case), often bringing evidence of continued threats (by Baker and other Menard staff) to the fore.  Defendant Baker, on his part, seems to have abandoned the case completely.  Though hearings for several of Plaintiff's motions for equitable relief were scheduled well in advance, Baker has consistently failed to show for those hearings (nor, the Court notes, has he ever asked for an extension of time).

Though the Court takes no position regarding Baker's ultimate liability on Plaintiff's claims, Baker's complete failure to adduce any evidence of his own lack of culpability damns his position at this early stage of the case, such that injunctive relief is warranted.  A word of warning: the factual and procedural bases for the undersigned's ruling are so rare that this Memorandum & Order should offer minimal, if any, persuasive value to those who wish to use it for precedential purposes.

For the reasons explained below, the undersigned **GRANTS** (**Doc. 64**) Plaintiff's Motion for a Preliminary Injunction and **ORDERS** Defendant Butler to,

within a week of the entry of this Memorandum & Order, **TRANSFER** Plaintiff to an institution other than Menard.

C<small>ASE</small> H<small>ISTORY</small>

Plaintiff, an inmate at Menard Correctional Center, claims Correctional Officer Baker has victimized him via frequent threats and physical abuse to the extent a transfer to another prison is warranted. (The parties have a history: according to the Amended Complaint, Baker's mistreatment of Plaintiff stems to confrontations between the two during Plaintiff's 2004 stint at Menard). Baker's actions include a July 2013 incident where he levelled a shotgun at Plaintiff, constant harassment (including threats Defendant will have other inmates assault Plaintiff), plus two assaults (in March and April 2014, respectively).

Pursuant to 42 U.S.C. § 1983, Plaintiff filed suit against Baker and Defendant Kim Butler (who, as Menard's warden, is named in her official capacity only, i.e. for the purposes of executing any injunctive relief) for $40,000 plus a permanent injunction requiring his transfer from Menard. Plaintiff first filed for a preliminary injunction in August 2013. A litany of similar motions followed. In February 2014, largely because Defendant Baker had been on indeterminate medical leave since summer 2013, thus lowering the likelihood Plaintiff would suffer irreparable harm. The Court clearly ordered that the warden "inform the Court in a prompt status report" should Baker return to work at Menard. (Doc. 47, 8).

3

Though Baker returned to work on March 11, 2014, the Court was not informed until March 17, 2014, when Plaintiff filed a motion indicating Baker threatened him on March 12, 2014. Plaintiff filed another motion for injunctive relief, and on June 2, 2014, Magistrate Judge Stephen C. Williams held a hearing on the matter. Though Baker had three weeks' notice of the hearing, he did not appear. A Menard HR employee testified that Baker had been on a leave of absence from May 6, 2014 (before the hearing was scheduled) until at least June 3, 2014—the day after the evidentiary hearing. Baker had provided a doctor's note in support of his medical leave, but did *not* request a continuance of the hearing.

At the June hearing, two inmates corroborated Plaintiff's testimony that Baker, upon his return from leave, continued to harass Plaintiff. Judge Williams found all three inmates' testimony credible and consistent, and found the timing of Baker's second leave of absence suspect. The undersigned adopted Judge Williams' Report & Recommendation for a limited preliminary injunction (to keep Plaintiff and Baker separate for the pendency of the case), and directed Warden Butler to submit a proposed plan to that effect.

Warden Butler's proposal—to keep Baker assigned to Menard's Medium Security Unit (a building physically separate from where Plaintiff is housed)—is bolstered by two points in her affidavit. First, Defendant Baker is on yet another "indefinite leave of absence." Secondly, Butler swears Plaintiff stated (on October 21, 2014) that he had not seen Baker since sometime in April 2014.

Technically, this case is still before the Court in the wake of the undersigned's adoption of Judge Williams' Report and Recommendation to grant a limited injunction to Plaintiff.  Given Baker's ongoing absence from the proceedings, and continued concerns about apparently credible threats to Plaintiff's safety, the undersigned scheduled a followup hearing for December 2014.

### DECEMBER 3 HEARING

Once again, Defendant Baker failed to testify at a court hearing.  According to a Menard HR staffer, Baker is once again on a medical leave of absence (one that has lasted from August 2014 until now).  His return date from that leave is undetermined.

Several witnesses testified for the defense.  Regina Price, who served as Plaintiff's prison counselor from approximately December 2013 until February 2014, explained the prison grievance system.  She further stated that she saw no entries in Plaintiff's file indicating that he ever complained about threats to him, and that she did not recall any verbal complains about Plaintiff's perceived safety.  However, she had submitted Plaintiff for a transfer away from Menard, and did not articulate why she did so.  When asked by the undersigned why, on January 22, 2014, she submitted him for a transfer, she could only speculate: "a lot of people request for Stateville to be close to family."[1]  Had Plaintiff asked for a transfer due to perceived safety threats, Price claims she "would have noted that."

---

[1] Stateville Correctional Center is located in Joliet, Illinois, a much shorter trip from Chicago (where many inmates have family) than Menard, which is located in Chester, Illinois.  Mitchell is from Chicago and has never had a visit at Menard.

Vicki Payne, Plaintiff's counselor from February 2014 to present, testified that Plaintiff inquired several times regarding his potential transfer to Stateville. Payne could not recall why Plaintiff had asked for a transfer (though records indicated she and Plaintiff had discussed the matter twice). Like Price, Payne speculated that prisoners often want to go from Menard to Stateville to be closer to family and get more visits. On cross, Payne did admit that Plaintiff—because he has been sentenced to over 20 years imprisonment—is only eligible for two prisons, Menard and Stateville.[2] According to Payne, Menard officials had approved a transfer, but it has been pending at the state level since July 2014—an admittedly "long time." To clarify why the decision has been pending for such a long time, the Court ordered defense counsel to supplement the record with information from the Illinois Department of Corrections regarding why Plaintiff had yet to be transferred.

Officer Brandon Anthony, a Menard Internal Affairs Officer, testified he interviewed Plaintiff on October 21, 2014. Anthony claims the interview was conducted after an internal affairs lieutenant received a call from Plaintiff's mother regarding his safety. During the interview (according to Anthony), Mitchell said he didn't feel safe because "staff was after him," and lobbied for a transfer. Anthony's interview form (which was not signed by Plaintiff) indicated that Mitchell pointed to April 2014 as the last time Plaintiff saw Baker.

---

[2] Pontiac Correctional Center also houses maximum security inmates like Plaintiff, but is only for segregation and protective custody inmates.

Officer Ryan Davis, an 11-year Menard veteran officer, testified that he was working the East Cell House (Plaintiff's home) on November 6, 2014 (the day Plaintiff said he was threatened by an officer named Davis).  Contrary to Plaintiff's account of that day, Ryan Davis claims he had no knowledge of the instant lawsuit, and (though he knows Defendant Baker) never threatened Plaintiff, did not carry pepper spray (much less spray Plaintiff with it), and is unaware that any officers have ever threatened Plaintiff.

Plaintiffs' witnesses told a different story.  Regarding November 6, 2014, Deon Davis (who had just moved into the cell next to Plaintiff's) testified that Ryan Davis stopped at Plaintiff's cell, said something about a lawsuit and an officer named Baker, and sprayed Plaintiff in the face with what appeared to be pepper spray.  Deon Davis remembered the November 6 date clearly, since he had (at 10:00 a.m., he testified) just returned to Menard from a court appearance.  He gave an accurate description of Officer Davis, and also testified with great specificity: that Officer Davis sprayed Plaintiff with his right hand just for a "quick second," and that after he called for help, Officer Davis warned inmate Davis (who had just sued him for excessive force and, apparently, lost) that he "hadn't learned [his] lesson."

Inmate Maurice Hardaway—who lived in the cell immediately below Plaintiff's—testified had heard several arguments between staff and Plaintiff, possibly about the instant suit.  Hardaway had heard through the grapevine that staff knew about Plaintiff's history with Defendant.  "I been in the penitentiary for 18 years," Hardaway testified, "and I am tired of hearing arguments and whatever

it is that you all be going through." Other than an incident in the chow hall where Plaintiff argued with some officers,[3] the only specifics mentioned by Hardaway were an incident where an officer two floors below yelled at Plaintiff, an incident on November 6 where "somebody was yelling," and that "I hear [officers] harass [Plaintiff] about [this] lawsuit." Hardaway, who is used to the smell of pepper spray, says he did not remember smelling pepper spray on November 6, but that it is sprayed often in the cell house. He could not recall pepper spray being sprayed in Plaintiff's cell.

Inmate Melvin Paige testified that, on approximately October 23, 2014, Plaintiff was shaken down by several officers who commented about what a "smart ass" Plaintiff was because he knew how to file law suits. Paige, who lived on the same level as Plaintiff, claims that one officer (a bald, white male) assaulted Mitchell during the exchange via a punch to the stomach.

Finally, Plaintiff testified regarding the continued harassment and assaults resulting from this lawsuit. He claims to have been constantly complaining about the assaults / harassment to his counselors, and that identifying officers who were attempting to intimidate him was difficult, and that IA Officer Brandon Anthony never interviewed him (and completely fabricated his report regarding the October 2014 interview).

---

[3] Some testimony regarding that incident—which apparently stemmed from a lieutenant's assessment that braids in Plaintiff's hair looked like a gang sign—also came in. The Court does not find that testimony pertinent to the instant controversy of whether Plaintiff is likely to succeed on the merits and faces a great enough threat of irreparable harm such that he should be transferred.

## December 10 Notice

As directed, defense counsel followed up with the Illinois Department of Corrections at the state level to discern why—despite the fact that Menard officials had put Plaintiff in for a transfer—Plaintiff's transfer was still being delayed at the state level.  According to counsel, the state transfer coordinator's office put a hold on the approved transfer request because the coordinator "wanted to explore options short of a transfer to resolve the alleged issues presented by the instant litigation." (Doc. 122, 1).  The IDOC "prefers to correct issues at the institutional level to deter lawsuits with the sole purpose of receiving a transfer," and "believes its plan to keep the Plaintiff separate from Officer Baker is a sufficient one."  (*Id.* at 2).

## Legal Standards

### 1. *Preliminary Injunction Standard*

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  *Accord Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").  To win a preliminary injunction, a plaintiff must show (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm without an injunction; (3) that the harm he would suffer is greater than the harm an injunction would inflict on the defendants; and (4) that the injunction is in the public interest.  *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010) (citing *Winter*, 555 U.S. at 20).  The "considerations are

interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge*, 612 F.3d at 546.

The scope of court authority to enter an injunction in the corrections context is circumscribed by the Prison Litigation Reform Act (PLRA). *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Under the PLRA, preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). *See also Westefer*, 682 F.3d at 683 (the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: prison officials have broad administrative and discretionary authority over the institutions they manage") (internal quotation marks and citation omitted).

The burdens at the preliminary injunction stage track the burdens at trial. *Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (quoting *Gonzales v. O Centro Espiranta Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). That any deadly harm suffered by Plaintiff would be "irreparable" is undisputed here. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (the Eighth Amendment "protects against future harm to inmates"; "It would be odd to deny an injunction to inmates who plainly proved [a] life-threatening condition in their prison on the ground that nothing yet had happened to them."). Whether an injunction should issue therefore depends largely on Plaintiff's likelihood of success

on the merits and the likelihood he will suffer harm. Those questions, in turn, hinge on the contours of Eighth Amendment caselaw that protects prisoners from abuse at the hands of correctional officers.

### 2. *Eighth Amendment Standard*

Unnecessary, wanton infliction of pain on a prisoner violates that prisoner's Eighth Amendment rights (incorporated as to the states via the Fourteenth Amendment). *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) (quoting *Whitney v. Albers*, 475 U.S. 312, 319 (1986)). Non-*de minimus* force[4] runs afoul of the Eighth Amendment's proscription against cruel and unusual punishments when it is intended maliciously and sadistically to cause harm. *Id.* at 476 (citing *Hudson v. McMillian*, 503 U.S. 1, (1992)). *See also Brown v. Plata*, 131 S.Ct. 1910, 1928 (2011) ("Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment.").

Serious threats need not manifest themselves in actual harm to a prisoner to be actionable under the Eighth Amendment. "[O]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (internal citation and quotation marks omitted). Inmates may, in seeking an injunction against a contemporary constitutional

---

[4] The distinction between *de minimus* and non-*de minimus*, of course, only applies in cases like this one, where the harm alleged by a plaintiff is (or potentially is) strictly the result of classical physics' definition of "force" (i.e., mass × acceleration). *Washington v. Hively*, 695 F.3d 641, 642–43 (7th Cir. 2012). The quantity of force behind the touching of an inmate loses its meaning in the context of, for example, the light application of a lit cigarette to a cheek, or the unwanted (if not high-impact) touching of an inmate's private parts intended to humiliate the victim. *Id.* at 643.

violation of a nature likely to continue, rely on developments that postdate the pleadings and pretrial motions. **Id. at 845–46 (internal citation and quotation marks omitted).**

ANALYSIS

The balance of the harms, considered as they must be in light of the public's interest, weigh heavily in favor of preliminary injunctive relief—particularly because the Court has seen *no* admissible evidence from Defendant regarding the underlying allegations or the allegations of continued mistreatment of Plaintiff.

### 1. *Likelihood of Success on the Merits; Likelihood of Harm*

On the record before the Court, Plaintiff has a substantial probability of success—including success on the notion that he faces a continuing constitutional harm—on the merits. Additionally, Plaintiff has shown a fair likelihood of harm absent an injunction. Given the interdependence of the factors (i.e., the higher the likelihood of success, the less net harm must be prevented, *Judge*, 612 F.3d at 546), the balance of the equities here tips toward injunctive relief.

At the outset, the Court notes it is confronted with a unique situation: a corrections officer defendant who has chosen to remain absent from § 1983 proceedings. As discussed above, Defendant Baker has now been absent for two evidentiary hearings. Though he could have asked to continue either hearing, he did not. Nor has his counsel given any indication of Baker's whereabouts, or the reasons for his absence, other than generic statements that he is on medical leave. An on-leave correctional officer could, at the very least, move for a continuance of

important evidentiary hearings.  That he has not done so, and that his leaves seem to fortuitously coincide with evidentiary hearings in the case, is suspect.  Should he continue to choose an almost complete abandonment of his defense, Plaintiff will effectively be able to introduce unrebutted evidence of Eighth Amendment violations at trial.

The more specific question of whether Plaintiff can show a continued risk of harm (so that permanent injunctive, and not just monetary, relief is part of his victory) overlaps significantly with the "likelihood of harm" prong.  Absent an injunction, there is ample evidence on the record that Plaintiff will face harm either by Defendant or on Defendant's behalf:

1. Prison records of Plaintiff's purported complaints against Baker are, for the IDOC's purposes, nebulous.  Counselors Price and Payne both discussed with Plaintiff reasons for a transfer.  Though they recorded the existence of those discussions, they did not note the discussions' contents.  Both counselors assure the Court that they "would have" recorded the reasons for Plaintiff's transfer request *if* those reasons implicated officer misconduct, but the fact remains they (though it would have been a miniscule amount of work) recorded *no* reasons for the request.  If Plaintiff were just trying to get a prison assignment closer to home, they should have noted as much.  In other words, IDOC records illuminate that Plaintiff was complaining about *something*, a point a factfinder could interpret as supporting a continued risk of harm to Plaintiff.

2. Similarly, IA Officer Anthony's testimony does little to lift the haze surrounding Plaintiff's allegations that he has continually complained about safety threats.  Even crediting his story, Anthony's interview with Plaintiff was sparked by a call from Plaintiff's mother complaining about threats to

Plaintiff's safety.  Anthony's testimony that Plaintiff lobbied for a transfer does little to diminish the idea that Plaintiff felt he was at risk, especially since Plaintiff knew he had been approved for a transfer (at the institutional level) and could have thought that transfer was the best route to safety.

3. Other witness testimony did not weigh particularly heavily in either direction.  Officer Ryan Davis' brief testimony included the somewhat conflicting statements that he did not know Plaintiff's name or face (he couldn't see Plaintiff during the hearing), but that he never sprayed Plaintiff with pepper spray.  (Such a categorical response could only be logically consistent if Davis, an 11-year veteran, had *never* used pepper spray on any inmate—a doubtful proposition in light of Maurice Hardaway's testimony that pepper spray is often used at Menard).  Inmate Deon Davis testified in great detail to the contrary—that Ryan Davis *did* confront Plaintiff and mention the instant lawsuit (or at least a lawsuit and Defendant Baker).  Inmate Hardaway and Inmate Paige both gave credible accounts that some officers continue to harass (and, in Paige's case, assault) Plaintiff due to his troubles with Defendant Baker.

4. Further informing the instant analysis are Magistrate Judge Williams' credibility findings underpinning his underlying Report and Recommendation.  "Plaintiff has offered unrebutted evidence which entitles him to a preliminary injunction.  … Plaintiff testified that every time he comes into contact with Defendant Baker, Baker harasses or threatens him in some way.  … [H]is [credible] testimony was backed up by two witnesses," one of whom saw Defendant kick Plaintiff in a confrontation that included the words "nigger," "coward," and "lawsuit," the other of whom described a shakedown in which Defendant repeatedly, unnecessarily, slapped Plaintiff in his cell.

5.  Finally, the Court finds the explanations by IDOC officials re: Defendant's oddly-timed absences from the proceedings insufficient to protect Plaintiff from a continued risk of harm from Defendant himself.  It has been, and continues to be, completely unclear *why* Defendant has taken leave (and failed to ask for continuances) when faced with court hearings, or *when* he will return from that leave.  The record strongly supports the inference that in March and April of last year, among Baker's first acts on returning from leave were to visit Plaintiff's cell and assault him.  The warden's 2014 failure to *immediately* notify the Court of Defendant's return from leave does little to encourage the undersigned that Plaintiff will be safe from Baker should he return to work at Menard (whether in the maximum security facility where Plaintiff is housed or in some other building).

The Court need not make ultimate credibility determinations to conclude that Plaintiff *could* convince a factfinder, on the evidence adduced, that he faces a continued, serious threat of constitutional harm, both in the form of First Amendment-violating retaliation (which does not necessarily require physical assault) and brute force.  Given the strong likelihood of success on the merits, that moderate risk of harm compounds to tip the balance of the equities strongly in Plaintiff's favor.

### 2. *Minimal Harm Against Defendants; Strong Public Interest*

The Court finds any potential harm to Defendant or the public to be inconsequential, and the public interest to be weighty.

As to the public interest, there will be no extra expense (at least not above the cost of a transfer—one for which Plaintiff has already been approved by some public officials) in enjoining Plaintiff's transfer.  On the contrary, the public has a

15

strong interest in ensuring that is corrections officers obey the law, and society's interest in enforcing constitutional bounds is also heavy. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1147 (10th Cir. 2013), *aff'd* 134 S.Ct. 2751 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Duran v. Anaya*, 642 F.Supp. 510, 527 (D.N.M. 1986) ("Respect for law, particularly by officials responsible for the administration of the State's correctional system, is in itself a matter of the highest public interest."). An injunction here will also serve to warn institutional defendants against abandoning their defense; in other words, *failing* to order a transfer on this record would undermine the public's interest in the Court's enforcement authority.

### 3. *PLRA's Directive: Avoiding Overbreadth*

Enjoining prison officials to transfer Plaintiff is the least intrusive means necessary to correct the continuing potential of harm to Plaintiff. Given the severity of the threats to Plaintiff's safety, the continued absence of evidence (and just plain absence) from Baker himself, and the potential complexity of this Court having oversight over Menard's human resources, a transfer of Plaintiff to Stateville (where he will be away from Defendant and his co-workers) is the least intrusive means the Court can see to protect Plaintiff from the risk of irreparable harm. Further, Menard officials have already approved Plaintiff for that transfer. Nothing could be *less* intrusive on the administration of the IDOC than having an official at the state level simply sign off on that already-contemplated action.

CONCLUSION

For the reasons articulated above, the Court enters an injunction against Defendant Kim Baker, as follows:

> AS SOON AS IS PRACTICABLE, BUT NO LATER THAN FEBRUARY 4, 2015, DEFENDANT KIM BUTLER SHALL TRANSFER PLAINTIFF CALVIN MITCHELL AWAY FROM MENARD CORRECTIONAL CENTER. BUTLER **SHALL** FILE A WRITTEN NOTICE OF COMPLIANCE UPON PLAINTIFF'S TRANSFER. PLAINTIFF SHALL NOT BE TRANSFERRED BACK TO MENARD DURING THE PENDENCY OF THIS CASE.

At the end of this case, this injunction will either: (1) become a permanent injunction, should Plaintiff prevail at trial and show continued, serious threat to his safety; or (2) expire, should Plaintiff lose on the merits or fail to show a continuing risk of harm.

Should Defendant lack the institutional authority to transfer Plaintiff, counsel for the defense shall notify the Court within twenty-four hours of the entry of this Order, so that the Court may add the proper IDOC defendant for the purposes of executing this injunctive relief.

Plaintiff's assorted motions asking for an emergency ruling on the injunction issue (Doc. 129, Doc. 128, Doc. 126, Doc. 111) are MOOT. His motion at 127, which seeks injunctive relief based on the physical conditions in his new cellhouse, is likewise MOOT, since he will be transferred away from that cellhouse. His motion to hold defense counsel in contempt (Doc. 123) for failing to inform Plaintiff of the results of the inquiry into why Plaintiff has not yet been transferred is DENIED, since counsel was under no such obligation.

The Court stresses again: this ruling is an extremely narrow one. This Memorandum & Order should not be cited for persuasive or precedential value unless the facts—including a correctional officer's complete absence from the proceedings—hew closely to the facts here.


**IT IS SO ORDERED.**
**DATE:** <u>January 21, 2015</u>                    <u>s/ *Michael J. Reagan*</u>
                                                      **MICHAEL J. REAGAN**
                                                      Chief Judge
                                                      UNITED STATES DISTRICT COURT